IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



UNITED STATES OF AMERICA,

v.                                    Criminal No. 3:19-cr-61

DAVID PEREZ-ALMEIDA,

      Defendant.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT'S MOTION TO
DISMISS COUNT ONE (ECF No. 20) (the "Motion to Dismiss"). For the
reasons set forth below, the Motion to Dismiss will be denied.

## BACKGROUND

### I. Procedural Context

David Perez-Almeida ("Perez-Almeida") is charged in a three-
count indictment with illegal reentry, pursuant to 8 U.S.C. §
1326(a) (COUNT I); possession of a firearm by an alien illegally
and unlawfully in the United States, pursuant to 18 U.S.C. §
922(g)(5) (COUNT II); and possession of cocaine, pursuant to 21
U.S.C. § 844 (COUNT III). See ECF No. 3. He has moved to dismiss
COUNT I (the "Motion to Dismiss") and to suppress evidence related
to COUNTS II and III (the "Motion to Suppress") (collectively, the
"Motions").[1] See ECF Nos. 19 and 20.

---

[1]    This MEMORANDUM OPINION addresses only DEFENDANT'S MOTION TO
DISMISS COUNT ONE (ECF No. 20). DEFENDANT'S MOTION TO SUPPRESS
EVIDENCE ON COUNTS TWO AND THREE (ECF No. 19) will be addressed in

The parties fully briefed both Motions, see ECF Nos. 19, 20, 22, 23, 25, 27, and the Court heard oral argument and received evidence on the Motions on June 18 and June 20, 2019.[2] Thereafter, the Court ordered the parties to submit supplemental briefing setting out their positions on both Motions in perspective of the evidence adduced during the evidentiary hearings. See ECF No. 39. The parties have submitted their supplemental briefing, and the Motion to Dismiss is ripe for decision.[3]

## II. Factual Background[4]

Perez-Almeida is a citizen of Mexico who does not have legal status in the United States. See ECF No. 22 at 1-3. On August 8, 2002, Perez-Almeida was stopped by Border Patrol agents near the United States-Mexico border. Gov't Ex. 2. Because he did not have any outstanding warrants or prior immigration history, he was given the privilege of a so-called "voluntary return," and he immediately

---

a separate MEMORANDUM OPINION.

[2]     The hearing transcript for June 18 is ECF No. 40 and the hearing transcript for June 20 is ECF No. 41. The hearing transcript is consecutively paginated, and this Opinion will use "Hr'g Tr.," followed by the page number, without reference to the ECF docket number.

[3]     Reply briefs for both Motions were to be filed by July 26, 2019, but neither party filed a reply brief. See ECF No. 39. However, that is the date that the Motions became ripe for the Court's consideration.

[4]     In this Opinion, only the factual background pertinent to the Motion to Dismiss is provided.

returned to Mexico (the return also appears to have occurred on August 8, 2002). Gov't Ex. 2; Hr'g Tr. 121 (testimony of Deportation Officer Richard Tine ("Tine")). Perez-Almeida confirmed that this "voluntary return" occurred. Hr'g Tr. 94-95.

Shortly thereafter, on or about August 28, 2002, Perez-Almeida returned to the United States.[5] He worked on a dairy farm in Vermont. Hr'g Tr. 85, 90. On March 15, 2005, Perez-Almeida (then age 19), was encountered by New York State Police when the vehicle in which he was traveling broke down. Def. Ex. 1; Hr'g Tr. 86. Thereafter, Perez-Almeida and the other occupants were interviewed by Border Patrol Agents. Def. Ex. 1. In the interviews, all of the vehicle's occupants "freely admitted to be[ing] from Mexico and illegally in the United States." Id. Perez-Almeida and the other passengers were brought to the Border Patrol office in Champlain, New York. Id.

On March 16, 2005, Perez-Almeida was personally served with a Form I-862, or a Notice to Appear (hereinafter, the "NTA"). Gov't

---

[5]     The Notice to Appear ("NTA") issued to Perez-Almeida on March 16, 2005 states that Perez-Almeida "arrived in the United States at or near McAllen, Texas, on or about August 28, 2002." Govt' Ex. 3. Officer Tine testified that there was no independent evidence that Perez-Almeida was encountered by immigration officials on August 28, 2002, Hr'g Tr. 123-24, but that it was reasonable to believe that Perez-Almeida had provided this date to immigration officials in 2005 when those officials were filling out the NTA. Hr'g Tr. 129-30. In other words, it is reasonable to believe that Perez-Almeida returned to the United States almost immediately after being given a voluntary return on August 8, 2002.

3

Ex. 3. The NTA informed Perez-Almeida (in English),[6] inter alia,
that he is not a United States citizen or national; that he is a
native of Mexico; that he had arrived in Texas on or about August
28, 2002; and then cited two provisions of the Immigration and
Nationality Act ("INA") under which Perez-Almeida was subject to
removal. Id. The NTA also informed Perez-Almeida that his
immigration hearing would be "on a date to be set at a time to be
set." Id. The hearing date was not set at the time of service of
the NTA because the computer system was not working. Def. Ex. 1;
Hr'g Tr. 89.

On the NTA, Perez-Almeida's address was listed as "156 West
Road Whiting Vermont 05778" (hereinafter, the "West Road
address"). Gov't Ex. 3. The "Certificate of Service" on the NTA
recites that Border Patrol Agent Catherine Edwards ("Edwards")
"provided oral notice in the Spanish language of the time and place

---

[6]    The record contains some examples of documents being provided
to Perez-Almeida in English, and some examples of documents being
provided to Perez-Almeida in Spanish. Perez-Almeida does not
assert that any aspect of this case involves whether he was, or
is, able to speak and understand English. In other words, no part
of his Motion to Dismiss rests on whether he was provided notice
in a language he could understand. Because Perez-Almeida has not
raised the argument, the Court concludes that all documents
relevant to the Motion to Dismiss were provided to Perez-Almeida
in a language that he speaks and understands. See also Ojeda-
Calderon v. Holder, 726 F.3d 669, 675 (5th Cir. 2013) ("Due process
allows notice of a hearing to be given solely in English to a non-
English speaker if the notice would put a reasonable recipient on
notice that further inquiry is required.").

4

of his or her hearing and of the consequences of failure to appear."[7]  Id. Perez-Almeida signed the "Certificate of Service" and his fingerprint is affixed thereto. Id.

Edwards also served Perez-Almeida (on March 16, 2005) with a Form I-826, or a "Notificación de Derechos y Solicitud de Resolución," explaining his rights, including his right to go before an immigration judge. Gov't Ex. 5; Def. Ex. 3.  The Form I-826 is written in Spanish and Edwards served it on Perez-Almeida in Spanish. Id. On the Form I-826, Perez-Almeida indicated that he wanted a hearing before an immigration judge. Id.; Hr'g Tr. 87 (Perez-Almeida's testimony that he "wanted to see a judge").

That same day (March 16, 2005), Edwards also provided Perez-Almeida with a Form I-830, or a "Notice to EOIR: Alien Address," indicating that Perez-Almeida's address was the West Road address,[8] and that Edwards had advised Perez-Almeida of the requirement to update immigration officials of any change of address. Gov't Ex. 4.  Perez-Almeida then was released on "personal recognizance," Gov't Ex. 4, pending his immigration hearing, notice of which would be mailed to the West Road address. Def. Ex. 1; Hr'g Tr. 89.

---

[7]    The statement that Perez-Almeida was provided "the time and place of his" hearing appears to be incorrect, given that the computer system was not working on March 16, 2005.

[8]    The Form I-830 also included a telephone number for Perez-Almeida. Hr'g Tr. 131.

Thereafter, on April 20, 2005, the immigration court in Buffalo, New York mailed a Notice of Hearing ("NOH") to Perez-Almeida at the West Road address. Def. Ex. 4; Gov't Ex. 6. The NOH, written in English, stated that Perez-Almeida's immigration hearing would take place on May 24, 2005 at 9:00 a.m. at the specified immigration court in Buffalo, New York. Id. The NOH also recited the consequences of failing to appear at the hearing, including that Perez-Almeida could be removed in absentia. Id.

The "Certificate of Service" on the bottom of the NOH lists a handwritten date of service of April 20, 2004 (although the top of the form lists a printed date of April 20, 2005). Id. The "Certificate of Service" indicates by the handwritten letter "M" that it was served by mail to Perez-Almeida, and by the handwritten letter "P" that it was personally served on Immigration and Naturalization Service ("INS") officials. Id.; Hr'g Tr. 134-35 (testimony of Officer Tine explaining that "M" signifies mail service and "P" signifies personal service). Officer Tine testified that the handwritten date of April 20, 2004 "would appear to be incorrect" based on other information on the form (e.g. the printed date at the top, the stamped date at the top, and the hearing date of May 24, 2005), and that the NOH appeared to have been generated on April 20, 2005. Hr'g Tr. 136.

Perez-Almeida testified that he never received the NOH or any

notice from the immigration court telling him about his immigration hearing. Hr'g Tr. 89-90; Def. Ex. 6 (affidavit of Perez-Almeida stating "I did not receive the Notice of Hearing, or any other mailings from the immigration court"). He further testified at the hearing that about 15 to 18 individuals were residing in the house in which he lived at the West Road address, Hr'g Tr. 92, and that all individuals in the house received mail in the same mailbox. Id. 90; see also Def. Ex. 8 (declaration of the Postmaster General that "mail addressed to various individuals is delivered to" the West Road address and that there "is only one physical mailbox for all of the residents who live at this address"). Perez-Almeida testified that if he had received notice of his immigration hearing, he would have gone to the hearing and requested to stay in the United States or to return to Mexico voluntarily. Hr'g Tr. 90-91.

Perez-Almeida did not appear at the May 24, 2005 removal hearing, and was ordered removed to Mexico in absentia (the "2005 Removal Order"). Gov't Ex. 7. Immigration officials mailed to Perez-Almeida at the West Road address the Order of the immigration judge under a cover letter informing Perez-Almeida that his removal was final unless he filed a motion to reopen. Id.; Hr'g Tr. 137. The "Certificate of Service" for this letter (and the accompanying Order) states that it was served by mail to Perez-Almeida and

7

personally served on INS officials on May 27, 2005 (three days after the immigration hearing). Gov't Ex. 7; Hr'g Tr. 137-38 (testimony of Officer Tine explaining service).

As a result of the 2005 Removal Order, a Form I-205, or "Warrant of Removal/Deportation," was issued for Perez-Almeida on June 7, 2005. Gov't Ex. 8. This document informs "any officer of the United States Immigration and Customs Enforcement" that Perez-Almeida "is subject to removal/deportation from the United States, based upon a final order by. . .an immigration judge in exclusion, deportation, or removal proceedings." Id. No immediate action was taken to enforce the Form I-205.

Then, on September 28, 2005, Perez-Almeida was stopped by Vermont State Police for speeding. Def. Ex. 5; A-file 14-B;[9] Hr'g Tr. 91 (testimony of Perez-Almeida). The state trooper contacted the Border Patrol, which confirmed that Perez-Almeida had an outstanding removal order against him (the 2005 Removal Order). A-file 14-B. The trooper transported Perez-Almeida and a passenger to the police barracks; thereafter, immigration officials took custody of Perez-Almeida. Id. Perez-Almeida was informed that he had been removed in absentia earlier in the year. Hr'g Tr. 91-92.

---

[9] "A-file" refers to Perez-Almeida's "Alien File," which was filed under seal with the Court. See ECF No. 33. The page number refers to the handwritten pagination at the bottom of the page.

8

On October 18, 2005, Perez-Almeida was removed to Mexico (he departed on foot), pursuant to the 2005 Removal Order. Gov't Ex. 8; Hr'g Tr. 138. He did not seek to reopen his in absentia removal for lack of notice,[10] or otherwise challenge his removal in any way.

After his October 2005 removal, Perez-Almeida again re-entered the United States without permission "[a]bout six months later, more or less." Hr'g Tr. 98 (testimony of Perez-Almeida). Perez-Almeida testified that he returned to the United States because "my life was here." Id. Perez-Almeida did not have a documented interaction with immigration officials again until August 20, 2014, when he was apprehended in Michigan. A-file 17-B. On August 21, 2014, Perez-Almeida was issued a Form I-871, or "Notice of Intent/Decision to Reinstate Prior Order." Gov't Ex. 9. The Form I-871 stated that Perez-Almeida was subject to removal pursuant to the May 24, 2005 removal order (i.e. that the 2005 Removal Order was to be reinstated). Id. Perez-Almeida acknowledged his receipt of the Form I-871 on August 21, 2014. Id.

Immigration official Shawn Wilson signed the Form I-871, which provided that Perez-Almeida was "subject to removal through

---

[10]    Pursuant to 8 U.S.C. § 1229a(b)(5)(C)(ii), an alien ordered removed in absentia can file a "motion to reopen. . .at any time if the alien demonstrates that the alien did not receive notice in accordance with paragraph (1) or (2) of section 1229(a) of this title. . ." (emphasis added).

reinstatement of the prior order." Gov't Ex. 9. A "Warrant of Removal/Deportation" was issued for Perez-Almeida on September 2, 2014, and he was removed (on foot) to Mexico that same day. Gov't Ex. 11; Hr'g Tr. 143. During the 2014 reinstatement proceedings, Perez-Almeida was represented by counsel. Gov't Ex. 10; Hr'g Tr. 141.[11] Once again, he did not seek to challenge or reopen his 2005 Removal Order.

Perez-Almeida then re-entered illegally once again, "approximately six or so months after being deported" in 2014 because "I had my children and my whole life was here, and I had to come back." Hr'g Tr. 99-100 (testimony of Perez-Almeida). He was not encountered by immigration officials again until his arrest on March 4, 2019 (the details of the traffic stop on March 4, 2019 are the subject of the Motion to Suppress). Perez-Almeida was then indicted by the grand jury on the three currently pending COUNTS on March 21, 2019. ECF No. 3.

---

[11]    Perez-Almeida indicated on the Form I-871 that he "wish[ed] to make a statement contesting this determination." Gov't Ex. 9. The record supports that Perez-Almeida had sought a "credible fear interview," but then withdrew that request. Gov't Ex. 10; Hr'g Tr. 141. The withdrawal was made while Perez-Almeida was represented by counsel.

## I.  Framework For Collateral Challenges To Prior Deportation Orders

In COUNT I, Perez-Almeida has been charged with illegal reentry under 8 U.S.C. § 1326(a).  To prove that charge, the Government will have to establish, inter alia, that Perez-Almeida "has been denied admission, excluded, deported, or removed," and that, thereafter, he reentered the United States without the permission of the United States Attorney General. 8 U.S.C. § 1326(a). In United States v. Mendoza-Lopez, 481 U.S. 828 (1987), the Supreme Court of the United States held that, in illegal reentry cases, an alien has a due process right to challenge the underlying deportation order.  Thereafter, Congress codified the due process requirements in 8 U.S.C. § 1326(d). See United States v. Moreno-Tapia, 848 F.3d 162, 165-66, 169 (4th Cir. 2017); see also United States v. Guzman-Velasquez, 919 F.3d 841, 845 (4th Cir. 2019). At bottom, Section 1326(d) "is concerned with failures of due process in an immigration proceeding that would make it fundamentally unfair to rely on a removal order coming out of that proceeding." Moreno-Tapia, 848 F.3d at 169. The statute focuses the inquiry on whether there were "procedural defect[s] in an immigration proceeding [that] insulate[] the resulting order from judicial review. . . ." Id.

Section 1326(d) sets out three elements that an alien must prove to challenge the underlying deportation order. In full, that subsection reads:

> In a criminal proceeding under this section [8 U.S.C. § 1326], an alien may not challenge the validity of the deportation order described in subsection (a)(1) or subsection (b) unless the alien demonstrates that—
>
> > (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
> >
> > (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
> >
> > (3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d) (emphasis added). The Fourth Circuit has held that, to satisfy Section 1326(d)(3), an alien "must show that (1) his due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects." United States v. El Shami, 434 F.3d 659, 664 (4th Cir. 2005) (quoting United States v. Wilson, 316 F.3d 506, 510 (4th Cir. 2003)). To show prejudice, the alien must show that, "but for the errors complained of, there was a reasonable probability that he would not have been deported." Id. at 665. An alien may be excused from meeting certain Section 1326(d) requirements if the underlying deportation proceeding was procedurally flawed in a material way. See Moreno-Tapia, 848 F.3d

at 169; United States v. Lopez-Collazo, 824 F.3d 453, 459-62 (4th Cir. 2016) (due process violation where alien was served the I-851 form in language he did not understand); El Shami, 434 F.3d at 662-64 (excusal from Sections 1326(d)(1) and (d)(2) and due process violation where alien did not receive notice of his immigration proceeding).

It is evident from the statutory text that the defendant must satisfy (or be excused from) all three elements of Section 1326(d) to succeed in a collateral challenge. The Fourth Circuit's recent decision in United States v. Cortez, __ F.3d __, 2019 WL 3209956, *3-5 (4th Cir. July 17, 2019), confirms that view. There, the Court of Appeals held that, while typically, the existence of a prior removal order is sufficient to meet the government's burden in an illegal reentry case, "there is an exception, allowing a defendant to collaterally attack a removal order" when a flaw in the original proceedings prevented the alien from seeking review of the removal order at the time it was issued. Id. at *3. But, "[u]nder 8 U.S.C. § 1326(d), a noncitizen must make each of three showings to come within that exception and mount a collateral attack," citing the three requirements of Section 1326(d), discussed above. Id. (emphasis added); see also id. at *5 (raising "significant doubts" that the jurisdictional argument raised by Cortez put him outside the requirements of Section 1326(d)).

13

The Fourth Circuit's approach outlined in Cortez confirms what this Court has held in several cases. See, e.g., United States v. Gonzalez-Ferretiz, No. 3:18-cr-117, 2019 WL 943388, *3-4 (E.D. Va. Feb. 26, 2019) (surveying Fourth Circuit and district court decisions and holding "that an alien may only challenge his underlying deportation order by satisfying the three requirements of Section 1326(d)"); see also Moreno-Tapia, 848 F.3d at 166; El Shami, 434 F.3d at 663; United States v. Gomez-Salinas, No.2:19cr10, 2019 WL 1141063, *2-4 (E.D. Va. Mar. 12, 2019) (Davis, C.J.) ("[A] defendant must satisfy all three provisions [of Section 1326(d)] before he may wage a collateral attack on the prior removal order."); United States v. Romero-Caceres, 356 F. Supp. 3d 541, 547 (E.D. Va. 2018) ("[D]efendant here may not challenge the June 2007 Removal Order unless he meets all three § 1326(d) requirements.").[12]

---

[12]    As the Court discussed in Gonzalez-Ferretiz, language in Moreno-Tapia and a recent opinion by Judge Brinkema suggest that collateral challenges outside of Section 1326(d) might be possible. See Moreno-Tapia, 848 F.3d at 170 ("We need not decide today. . .whether due process might in some circumstances demand that an immigration order based on an unconstitutional conviction be subject to collateral attack."); United States v. Rivera Lopez, 355 F. Supp. 3d 428, 435 (E.D. Va. 2018) (it "remains an open question" whether "due process requires that a defendant be given an opportunity to bring a collateral attack beyond the requirements and limitations of § 1326(d)") (emphasis in original).

Cortez teaches that such cases, if any, will be exceedingly rare. See Cortez, 2019 WL 3209956 at *3-5 (noting that Cortez must

The burden of proof to establish that the elements of Section 1326(d) have been satisfied "rests with the defendant." United States v. Galcia, No. 1:15cr59, 2016 WL 4054926, *2 (E.D. Va. July 26, 2016). And, that burden must be met by "a preponderance of the evidence." Id. (citing several cases). If the alien meets his burden, "the illegal reentry charge must be dismissed as a matter of law." El Shami, 434 F.3d at 663 (citing Wilson).

In sum, collateral challenges in Section 1326 prosecutions must proceed pursuant to Section 1326(d) because of the clear statutory text and articulated Congressional intent. [13] Accordingly, if the Court determines that Perez-Almeida has failed to satisfy any of the three elements of Section 1326(d), his collateral challenge must be rejected, and the Motion will be denied. Conversely, if Perez-Almeida satisfies (or is excused

_____

demonstrate that "there is some exception-to-the-exception that would allow him to bypass these normal requirements" of Section 1326(d)); id. at *4-5 (rejecting "exception-to-the-exception" based on Cortez's subject matter jurisdiction argument).

[13] The "Section-by-Section" analysis of the legislation that added Section 1326(d) states that the new subsection "allow[s] a court in a criminal proceeding against a deported alien who re-enters the U.S. to re-examine the underlying deportation order only if the alien" satisfies the three requirements of Section 1326(d). 140 Cong. Rec. S.5558-01 (daily ed. May 11, 1994), 1994 WL 181390, at *S5571 (emphasis added). "This language taken from United States v. Mendoza-Lopez, 481 U.S. 828 (1987), is intended to ensure that minimum due process was followed in the original deportation proceeding while preventing wholesale, time consuming attacks on underlying deportation orders." Id.

15

from) the three elements of Section 1326(d), the illegal reentry indictment must be dismissed. See El Shami, 434 F.3d at 663.

## II. Analysis

Perez-Almeida's Motion rests on two arguments. First, he argues that the immigration court lacked jurisdiction to order him removed in 2005 because of defects in the NTA provided to him (i.e. the lack of date and time information). Second, he argues that he can satisfy the requirements of Section 1326(d) because he did not receive notice of his 2005 removal proceedings and can demonstrate prejudice. See generally ECF Nos. 20, 27, 43. Neither argument is meritorious, and, thus the Motion to Dismiss will be denied.

### A. Jurisdiction Of The Immigration Court

In his opening brief in support of the Motion, Perez-Almeida raises the now-familiar argument (brought pursuant to Pereira v. Sessions, 138 S.Ct. 2105 (2018)) that the immigration court lacked jurisdiction to order him removed in 2005 because the NTA he received did not contain the date and time of his removal hearing. See ECF No. 20 at 4-17. In his reply brief, however, Perez-Almeida stated that he was "submit[ting] on his motion" on this issue in light of this Court's decision in United States v. Diaz-Martinez, 380 F. Supp. 3d 486, 507-510 (E.D. Va. 2019), and did not address the argument further. ECF No. 27 at 3 n.3. At oral argument, counsel for Perez-Almeida confirmed that she recognized

16

that, as far as the Court was concerned, the Pereira issue was governed by the decision in Diaz-Martinez, but wanted to preserve the issue for appeal. Hr'g Tr. 83.

Perez-Almeida is correct that the Court's decision in Diaz-Martinez, a similar factual case in which the alien was deported in absentia, governs the same issue as raised in this case, and the Pereira portion of the Motion could be rejected on that ground alone. But, more importantly, the Fourth Circuit's recent Cortez decision also forecloses the jurisdictional argument (and is, of course, binding on this Court).

In Cortez, the Fourth Circuit squarely addressed and rejected the jurisdictional argument raised by Perez-Almeida, holding that the fact that the NTA did not include the date and time of the removal hearing "does not implicate the immigration court's adjudicatory authority or 'jurisdiction.'" See Cortez, 2019 WL 3209956 at *5; id. at * 6 (8 C.F.R. § 1003.14(a) "is not a jurisdictional rule"). Further, the Court of Appeals explained that "[i]t is the regulatory definition of 'notice to appear,' and not § 1229(a)'s definition, that controls in determining when a case is properly docketed with the immigration court under 8 C.F.R. § 1003.14(a)," and these regulations do not require the NTA to contain the date and time of the removal hearing.[14] Id. at *8-10.

---

[14] What is more, Cortez strongly questioned the assumption (but

17

<u>Cortez</u> precludes the jurisdictional argument raised by Perez-Almeida.[15]

## B. Section 1326(d)

Perez-Almeida next argues that he can satisfy (or is excused from) the three requirements of 8 U.S.C. § 1326(d), and thus, the illegal reentry charge (COUNT I) must be dismissed. See generally ECF No. 43. That argument is premised on the alleged lack of notice of the date and time of his 2005 removal hearing. More particularly, Perez-Almeida contends that, because he did not have notice of when his hearing would be, he is excused from Sections 1326(d)(1) and (d)(2),[16] and that he has established a due process

---

did not affirmatively answer) that a subject matter jurisdiction argument, such as the one raised here, can even be brought on a collateral attack under Section 1326. See <u>Cortez</u>, 2019 WL 3209956 at *3-5.

[15]  Perez-Almeida briefly raises the argument that the statute governing <u>in absentia</u> removals, 8 U.S.C. § 1229a(b)(5), cites to the statutory provision defining an NTA found at 8 U.S.C. § 1229(a), thus requiring that the date and time of his removal hearing be in the NTA. See ECF No. 20 at 14-15. To the extent that Perez-Almeida is arguing that this omission deprives the immigration court of "jurisdiction," that argument is foreclosed by <u>Cortez</u>. However, at bottom, what Perez-Almeida is actually arguing is that he did not have notice of his hearing. That due process argument will be discussed in the section below under the rubric of Section 1326(d).

[16]  There is no dispute that Perez-Almeida did not seek any administrative relief for or judicial review of his 2005 removal order. Rather, Perez-Almeida's argument under Section 1326(d) requires that he be excused from satisfying the administrative relief and judicial review prongs of Section 1326(d)(1) and (d)(2) based on a lack of notice of his hearing.

18

violation under Section 1326(d)(3). Perez-Almeida further argues that he can demonstrate prejudice under Section 1326(d)(3) because, but for this due process violation (lack of notice), there is a "reasonable probability" that would not have been deported. See generally ECF No. 43. The Government argues that the evidence does not support Perez-Almeida's claim that he did not receive notice of his hearing and that Perez-Almeida has not established prejudice. See generally ECF No. 44.

This Court recently set forth the proper framework for analyzing claims like the one here where the alien claims to have not received notice of his removal hearing (and was subsequently removed in absentia). See Diaz-Martinez, 380 F. Supp. 3d at 497-507. Applying that same framework in this case is appropriate, and indeed, the parties make their arguments within that framework. See ECF Nos. 43, 44. Under Diaz-Martinez, if Perez-Almeida establishes that he did not have notice of the date and time of his removal hearing, he will be excused from Section 1326(d)(1), (d)(2), and will have satisfied the due process component of the analysis under Section 1326(d)(3). See 380 F. Supp. 3d at 497, 503-04.

As set forth below, however, the record does not permit a finding that Perez-Almeida did not receive notice of his 2005 removal hearing. Thus, he is not excused from satisfying Section

19

1326(d)(1) and (d)(2). Nor has he established the required due process violation. Thus, the Motion will be denied.

### (1) Perez-Almeida Has Not Established That He Did Not Receive Notice Of His 2005 Removal Hearing

It is uncontroverted that an alien must be provided written notice of removal proceedings. See, e.g., 8 U.S.C. § 1229(a); El Shami, 434 F.3d at 663-65. Since 1996, the removal statute has required that the notice be given "in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any)." 8 U.S.C. § 1229(a)(1); Nibagwire v. Gonzales, 450 F.3d 153, 156 (4th Cir. 2006) (explaining that regular mail service has been permitted since 1996). Service by regular mail "shall be sufficient if there is proof of attempted delivery to the last address provided by the alien. . . ." 8 U.S.C. § 1229(c).

Here, the record is clear that the NTA was personally served on Perez-Almeida, but that the NTA did not provide the date and time of his removal hearing because the computer system was down. See Gov't Ex. 3; Def. Ex. 1; Hr'g Tr. 89. Instead, the date and time information was provided in the subsequent NOH, which was sent by regular mail on April 20, 2005 to the West Road address in Vermont where Perez-Almeida lived. Def. Ex. 4; Gov't Ex. 6; Hr'g Tr. 134-35. Perez-Almeida now asserts that he did not receive the NOH. See Def. Exs. 4, 6; Gov't Ex. 6; Hr'g Tr. 89-90.

20

To resolve the Motion, it is necessary to first review presumptions applicable to mail receipt and delivery, as set forth in Diaz-Martinez, 380 F. Supp. 3d at 498-501. Then, the Court will apply this presumption to the evidence in the case.

### (a) Presumptions Applicable To Mail

Before dealing with service by mail in the immigration context, and to properly analyze the record evidence, it is necessary to discuss the general presumption that applies to mail delivery (sometimes referred to as the "mailbox rule"). As the Eleventh Circuit has succinctly put it:

> The common law has long recognized a rebuttable presumption that an item properly mailed was received by the addressee. Nunley v. City of Los Angeles, 52 F.3d 792, 796 (9th Cir. 1995). The "presumption of receipt" arises upon proof that the item was properly addressed, had sufficient postage, and was deposited in the mail. The presumption is, of course, rebuttable.

Konst v. Fla. E. Coast Ry. Co., 71 F.3d 850, 851-52 (11th Cir. 1996) (footnote omitted). The Supreme Court of the United States has recognized the presumption: if a letter "properly directed is proved to have been either put into the post-office or delivered to the postman, it is presumed ... that it reached its destination at the regular time, and was received by the person to whom it was addressed." Rosenthal v. Walker, 111 U.S. 185, 193 (1884). This is "not a conclusive presumption of law, but a mere inference of fact,

21

founded on the probability that the officers of the government will do their duty and the usual course of business." Id. at 193-94 (citations omitted). The Court went on to explain that, when the presumption "is opposed by evidence that the letters never were received, [it] must be weighed with all the other circumstances of the case, by the jury in determining whether the letters were actually received or not." Id.; see also FDIC v. Schaffer, 731 F.2d 1134, 1137 n.6 (4th Cir. 1984) (citation omitted) ("A letter properly addressed, stamped and mailed is presumed to have been duly delivered to the addressee. . . .The presumption is especially strong when the delivery is by certified mail."); Lupyan v. Corinthian Colleges Inc., 761 F.3d 314, 319-323 (3d Cir. 2014); 2 McCormick on Evidence § 343 (7th ed., 2016 update); 2 Jones on Evidence § 10:3 (7th ed., 2019 update).

The Third Circuit's Lupyan case provides a good overview of the common law mailbox rule, including what it takes to raise the presumption and, in the context of regular mail, the kind of evidence that is sufficient to overcome it. See 761 F.3d at 319-323. In Lupyan, the Third Circuit noted that there is "[a] 'weaker presumption' [of receipt]. . .where delivery is sent via regular mail, for which no receipt, or other proof of delivery, is generated." Id. at 319 (quoting Santana Gonzalez v. Att'y Gen., 506 F.3d 274, 279 (3d Cir. 2007)). To raise the presumption that

the addressee received a particular mailing that is sent by regular mail, circumstantial evidence, such as "evidence of business practices or office customs pertaining to mail" is appropriate. Id. But, a party giving a sworn statement about mail practices must "have personal knowledge of the procedures in place at the time of the mailing." Id. at 320 (internal quotation omitted).

Once there is sufficient evidence that the mailing took place, "the presumption of receipt imposes the burden of production on the party against whom it is directed[.]" Id. (alteration in original and internal quotation omitted). The party against whom the presumption operates must then put forth evidence to rebut the presumption, thereby "destroy[ing] that presumption, leaving only that evidence and its inferences to be judged against the competing evidence and its inferences to determine the ultimate question at issue." Id. (citation omitted). In Lupyan, the court held that "a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue," even if "selfserving," was sufficient to create a material fact at the summary judgment stage in a civil case. Id. at 320-23 (citations omitted). To hold otherwise—in other words, to "requir[e] more than a sworn statement to dispute receipt"—would "elevate[] the weak presumption intended by the mail box rule to a conclusive presumption that would be equivalent to an ironclad

23

rule." Id. at 322.

Other courts, including the Fourth Circuit, have hewed to a similar framework to that outlined in Lupyan. For example, the Fourth Circuit held that testimony by a bank president who "saw to it the notices were put in an envelope and addressed to [the intended recipient] and put in the bank's mail, which in the ordinary course was daily posted" was "sufficient to create a presumption that the notices were duly mailed, and in the ordinary course reached the addressee, though of course it is for the jury to say, in view of her denial, whether this is true or not." Citizens' Bank & Tr. Co. of Middlesboro, Ky. v. Allen, 43 F.2d 549, 552 (4th Cir. 1930); see also Gen. Elec. Co. v. Brown Transp. Corp., 597 F. Supp. 1258, 1261 (E.D. Va. 1984) ("It is commonly recognized that evidence of a common business practice is sufficient to establish that a letter was mailed."); Laborer's Int'l Union of N. America, Local 578 v. N.L.R.B., 594 F.3d 732, 740 (10th Cir. 2010) (Gorsuch, J.) ("[A]n opposing party's sworn denial of receipt can 'create[] a credibility issue that must be resolved by the trier of fact.'") (citation omitted) (alterations in original).

In sum, where a letter is sent by regular mail and there is evidence (typically through a sworn statement by one with personal knowledge of the mailing or mail procedures) that the letter was

24

mailed, there is a presumption in federal court that the addressee received it. Once the presumption is raised, the recipient must put forward evidence of non-receipt. With regular mail, the recipient can put forward, for example, a sworn statement of non-receipt. See Lupyan, 761 F.3d at 320-22. Then, the issue of receipt becomes one for the trier of fact.

In the immigration context, the mail presumption has often come up in the context of "motions to reopen" in absentia removal orders.[17]  In evaluating a motion to reopen where service was by regular mail, the Fourth Circuit first noted that, when immigration officials serve "an alien with notice of a removal hearing by regular mail, as allowed by current law, the agency is entitled to a presumption of effective delivery." Nibagwire, 450 F.3d at 154. This, of course, comports with the general presumption outlined above.  The presumption applicable to regular mail is not as strong as the presumption of delivery of certified mail, but nonetheless exists.[18] See id. at 156-58; Santana Gonzalez, 506 F.3d at 278

[17]  As explained above, see supra, n.10, an alien ordered removed in absentia can file a motion to reopen at any time if she can demonstrate that she did not receive notice of her removal hearing. Thus, the focus in a motion to reopen is on whether the alien received notice. See Santana Gonzalez, 506 F.3d at 277; Lopes v. Gonzales, 468 F.3d 81, 83 (2d Cir. 2006); Joshi v. Ashcroft, 389 F.3d 732, 736 (7th Cir. 2004).

[18]  Before a change in the law in 1996, removal notices (like the NOH at issue in this case) had to be served in person or by certified mail. See El Shami, 434 F.3d at 663-64; Nibagwire, 450

25

(citing cases from the Second, Fourth [Nibagwire], Seventh, Eighth, and Ninth Circuits that have come to the same conclusion). As the Fourth Circuit concluded in Nibagwire,

> Accordingly, in Nibagwire's case where the notice was sent by regular mail, the BIA abused its discretion by applying both the delivery presumption for certified mail and Grijalva's evidentiary standard for rebutting the presumption. Maknojiya v. Gonzales, 432 F.3d 588, 589 (5th Cir. 2005) (per curiam); Ghounem, 378 F.3d at 744-45; Salta, 314 F.3d at 1079. On remand the regular mail delivery presumption and the parallel evidentiary standard for rebutting the presumption must be used in evaluating the evidence on the receipt of notice issue.

450 F.3d at 157. Although, in Nibagwire, the Fourth Circuit did not determine the evidence that would be necessary to "(1) rebut the presumption that regular mail is delivered and (2) prove that [Nibagwire] did not receive the notice to appear," but it did note that Nibagwire had filed an asylum application, had showed up for an asylum interview, and supplied a number of relevant facts in an affidavit. Id. The Court remanded to the BIA for further consideration. Id. at 158.

Other courts have held that, with service by regular mail, a sworn affidavit by the alien can be sufficient to rebut the

---

F.3d at 156-57. A "strong presumption of delivery is justified for certified mail because of the extra assurances of effective delivery provided by the U.S. Postal Service." Nibagwire, 450 F.3d at 156.

presumption of delivery and receipt and entitle the alien to an evidentiary hearing, at least where the alien "initiates a proceeding to obtain a benefit, appears at an earlier hearing, and has no motive to avoid the hearing." Salta v. I.N.S., 314 F.3d 1076, 1079-80 (9th Cir. 2002); Ghounem v. Ashcroft, 378 F.3d 740, 743-45 (8th Cir. 2004); Santana Gonzalez, 506 F.3d at 280. The Ninth Circuit has clarified post-Salta "that an affidavit is one way to establish non-receipt of a notice sent by regular mail. . . .But a sworn affidavit is not always necessary." Sembiring v. Gonzales, 499 F.3d 981, 989 (9th Cir. 2007). Rather, the test "is practical and commonsensical rather than rigidly formulaic." Id. at 988. The BIA has endorsed a flexible approach to determining whether the weaker regular mail presumption has been overcome. See Matter of M-R-A, 24 I. & N. Dec. 665, 674-75 (2008) (describing multiple factors an immigration judge is to consider).

The Court recognizes that those immigration cases were in a different posture than is this case (i.e. they deal with motions to reopen while this case is a collateral challenge to the 2005 Removal Order). However, in the absence of a contrary approach (which the parties have not suggested), it seems best to continue following the approach outlined in Diaz-Martinez, as set explained above.[19]

---

[19]    The Court is aware of the so-called "presumption of

27

### (b) Application To The Evidence In This Case

Considering the evidence presented in this case within the foregoing framework, the Court concludes that Perez-Almeida has not satisfied his burden to demonstrate that he did not receive notice of the date and time of his 2005 immigration hearing.

To begin, the Government did not introduce testimony of the sort that usually animates the presumption. However, the Government introduced the NOH (Gov't Ex. 6) that was properly addressed to the West Road address and included the date and time (May 24, 2005 at 9:00 a.m.) for Perez-Almeida's removal hearing.[20]

---

regularity" and notes that it could have some effect on the analysis of collateral challenge cases like this one. See Parke v. Raley, 506 U.S. 20, 29-30 (1992). This "presumption[,] deeply rooted in our jurisprudence," applies to collateral attacks, and holds that "every act of a court of competent jurisdiction shall be presumed to have been rightly done, till the contrary appears." Id. (quoting Voorhees v. Jackson, 35 U.S. (10 Pet.) 449, 472 (1836)); see also, e.g., Coreas v. Holder, 526 Fed. Appx. 322, 326 (4th Cir. 2013) (unpublished) (per curium); Almy v. Sebelius, 679 F.3d 297, 309 (4th Cir. 2012); United States v. Arevalo-Tavares, 210 F.3d 1198, 1200-01 (10th Cir. 2000); United States v. Arita-Campos, No. 2:05CR48, 2009 WL 306394, *3-4 (N.D. Ind. 2009), aff'd, United States v. Arita-Campos, 607 F.3d 487 (7th Cir. 2010).

The parties have not raised this presumption or made any argument that it applies here. In the absence of the parties' views and arguments on this presumption, it will not be applied in this case.

[20] The Government also introduced the 2005 Removal Order itself, under a cover letter addressed to Perez-Almeida at the West Road address, and with a "Certificate of Service" indicating mail service on May 27, 2005. Gov't Ex. 7. This is further evidence that the Government had the proper address for Perez-Almeida.

There is no dispute that, at all relevant times during 2005 (when the NOH was allegedly mailed), Perez-Almeida lived and worked at the West Road address. See, e.g., Hr'g Tr. 85, 89-91 (testimony of Perez-Almeida). Further, the NOH's "Certificate of Service" indicates that it was served by mail on Perez-Almeida and was signed by court staff (but the signature is illegible), indicating service. Gov't Ex. 6.

The Government's witness, Deportation Officer Richard Tine, testified about the requirements that an alien must keep his address up-to-date with immigration officials so that officials know where to send hearing notices. Hr'g Tr. 132-33. And, Tine explained that the NOH reflected that it was served on Perez-Almeida "[t]hrough mail service." Id. 135. He further testified, based on the A-file, that the handwritten date of April 20, 2004 on the "Certificate of Service" appeared to be a mistake and that the NOH appeared to have been generated on April 20, 2005. Id. 136.

On cross-examination, Officer Tine acknowledged that he did not have personal knowledge of the practices and procedures in place for the immigration court in Buffalo in 2005 and that his knowledge of Perez-Almeida's immigration record from 2005 came from his review of the A-file. Hr'g Tr. 145-48. Indeed, Officer Tine was not employed as an immigration officer in 2005. Id. 119.

29

As was the case in Diaz-Martinez, the Government's evidence that it mailed the NOH to Perez-Almeida is weak. Nonetheless, the evidence is sufficient to raise the presumption of proper delivery and thus receipt by Perez-Almeida. That conclusion is supported by the following evidence: (1) that the correct address for Perez-Almeida was listed on the NOH; (2) that the NOH's "Certificate of Service" shows service by "mail"; and (3) that Officer Tine provided general testimony about his knowledge that aliens must keep their addresses updated so that notices could be sent to them (and Perez-Almeida was so instructed). That is sufficient where, as here, the issue of non-receipt rears its head nearly 15 years after the fact. See Diaz-Martinez, 380 F. Supp. 3d at 502 (presumption raised on similar evidence). Accordingly, Perez-Almeida must put forward credible evidence that he did not receive notice of his hearing.

The next issue is whether Perez-Almeida has rebutted the presumption that a regular mail letter is presumed to be delivered and received by the recipient. Here, unlike in Diaz-Martinez, 380 F. Supp. 3d at 502, the Court has unequivocal evidence on that point: direct testimony from Perez-Almeida that he did not receive information from the immigration court about the date, time, and location for his removal hearing, Hr'g Tr. 89-90, and a sworn affidavit from Perez-Almeida that he did not receive "the

30

Notice of Hearing, or any other mailings from the immigration court." Def. Ex. 6. That is sufficient to rebut the presumption of effective delivery and receipt. See, e.g., Santana Gonzalez, 506 F.3d at 278-281; Salta, 314 F.3d at 1079.[21]

With the presumption rebutted, the Court must weigh the evidence in the record and determine whether Perez-Almeida has carried his burden to show that he did not receive notice of his hearing. That he has not done.

First, the documentary evidence in the record supports a finding that Perez-Almeida received the NOH. The NOH was properly addressed to Perez-Almeida at the West Road address. But see United States v. Ramos-Delcid, No. 3:18-cr-20, 2018 WL 5833081, *6-7 (W.D. Va. Nov. 7, 2018) (immigration notices mailed to incorrect address). There is no dispute that Perez-Almeida lived at that address during the relevant time period. See, e.g., Hr'g Tr. 85, 89-91. There is a "Certificate of Service" that indicates service

---

[21]  Of course, cases like Salta and Santana Gonzalez (which cited the rule from Salta) held that "[w]here a petitioner actually initiates a proceeding to obtain a benefit, appears at an earlier hearing, and has no motive to avoid the hearing, a sworn affidavit from [petitioner] that. . .she. . .[did not] receive[] the notice should ordinarily be sufficient to rebut the presumption of delivery and entitle [petitioner] to an evidentiary hearing. . . ." Salta, 314 F.3d at 1079 (emphasis added) (some alterations in original). Here, it is clear that Perez-Almeida had a motive to avoid his removal hearing. However, given both the affidavit and Perez-Almeida's testimony in this case, the Court concludes that Perez-Almeida has rebutted the presumption of delivery and receipt.

31

by mail to Perez-Almeida. Gov't Ex. 6; but see El Shami, 434 F.3d at 662-64 (Government unable to provide any evidence of notice to the alien and stipulated that there was no evidence to that effect). On the other hand, it is true that the Government has not put forward the testimony of someone with direct personal knowledge of the mailing of the NOH. That fact must also be weighed by the Court.

It is also true that the "Certificate of Service" on the NOH indicates that it was mailed on April 20, 2004 (this date was handwritten). Gov't Ex. 6. However, the Court finds that the handwritten date was made in error, and that the evidence supports that the date of service of the NOH was April 20, 2005. That evidence is that: (1) the printed date at the top of the NOH states April 20, 2005; (2) the removal hearing date was scheduled for May 24, 2005; (3) the NTA was served on March 16, 2005, Gov't Ex. 3; and (4) the testimony of Officer Tine that the 2004 date appeared to be a mistake. Taken together, this evidence supports the conclusion that the NOH was served in April 2005, not April 2004.

Second, the Court has direct evidence of non-receipt from Perez-Almeida. Hr'g Tr. 89-90; Def. Ex. 6. However, that evidence must be considered in perspective of other evidence in the record and in perspective of Perez-Almeida's credibility. See Derezinski v. Mukasey, 516 F.3d 619, 621-23 (7th Cir. 2008) (Posner, J.) ("[A]

bare, uncorroborated, self-serving denial of receipt, even if sworn, is weak evidence" for the trier of fact because it is simple to "submit an affidavit in which one attests that one didn't receive a particular piece of mail"); Matter of M-R-A, 24 I. & N. Dec. 665, 673-74 (BIA 2008) (immigration judge's consideration of motion to reopen requires consideration of "both circumstantial and corroborating evidence").

Here, Perez-Almeida's testimony is, in essence, that he did not receive the NOH, but that, if he had, he would have appeared at his removal hearing and asked to remain in the United States or would have sought voluntary departure. See, e.g., Hr'g Tr. 89-90. Several other parts of Perez-Almeida's testimony and his subsequent interactions with immigration officials, however, counsel against crediting this assertion. For example, as discussed supra n.5, the Court finds it reasonable to conclude, based on the evidence in the record, that in August 2002, Perez-Almeida was encountered by Border Patrol agents immediately upon crossing the United States-Mexico border; that he was given a voluntary return to Mexico; and that, a few weeks later, he illegally returned to the United States. Gov't Ex. 3; Hr'g Tr. 123-24. This shows a rather substantial disregard for the immigration laws, and it also shows that Perez-Almeida was on notice that interactions with immigration officials could lead to

being sent back to Mexico.

Perez-Almeida also testified that, in 2005, his "parents and [his] cousins and [his] brother, [and] sister" were all living in the same house at the West Road address. Hr'g Tr. 90; id. 103 (Perez-Almeida testifying that "two brothers and then my brother's wife and then my brother-in-law and then three cousins and one friend" all lived in the same house). In other words, much of his family was in the United States, which provides a powerful motive for Perez-Almeida to want to remain in the United States, rather than to appear at an immigration hearing and possibly face removal (a consequence of which he was well-aware from his August 2002 voluntary return to Mexico).

Third, after the voluntary return in 2002, and after each of his two removals (in 2005 and 2014), Perez-Almeida returned to the United States almost immediately, testifying that he did so because "my life was here," Hr'g Tr. 98, and because "I had my children and my whole life was here, and I had to come back." Hr'g Tr. 99–100. This evidence further supports the reasonable conclusion that Perez-Almeida had a strong motive to avoid his 2005 immigration hearing (because his family was here and he did not want to leave the United States), and it undercuts his assertion that he did not receive the NOH.

Fourth, Perez-Almeida's subsequent interactions with

34

immigration officials refute his current argument that he lacked notice of his 2005 removal. When he was encountered in September 2005 and informed that he had been removed in May 2005, he did not raise the argument that he never received notice of his removal hearing or file a motion to reopen based on lack of notice. Later, in 2014, when he was represented by counsel, he did not file a motion to reopen based on lack of notice. See Gov't Ex. 10. Perez-Almeida raises this argument of non-receipt only now that he faces criminal charges for illegal reentry. In determining whether to credit Perez-Almeida's assertion of non-receipt, it is appropriate to consider when he has raised it (i.e. when he faces a felony charge for illegal reentry) and the circumstances under which it was raised for the first time.

Fifth, although it appears that Perez-Almeida wants the Court to infer a lack of receipt from the large number of people (15 to 18) living in the house,[22] the mere fact that a large number of people live in a single house and receive mail in the same mailbox does not establish that the NOH was not delivered or received by Perez-Almeida. Cf. In re G-Y-R, 23 I. & N. Dec. 181, 189 (BIA 2001) ("If, for example, the Notice to Appear reaches the correct address but does not reach the alien through some failure in the internal

---

[22] See Hr'g Tr. 90-92; see also Def. Ex. 8 (Postmaster General's declaration).

workings of the household, the alien can be charged with receiving proper notice, and proper service will have been effectuated."). And, Perez-Almeida acknowledged that all of the individuals who lived in the house at the West Road address were in the United States illegally, Hr'g Tr. 103, which suggests that they had a motive to avoid interactions with immigration officials.

Moreover, there is no evidence in the record that other residents at the West Road address had problems receiving mail. While the lack of evidence on that point is not dispositive, it is probative on the assertion of whether the NOH was received.[23]

In sum, the Court concludes that Perez-Almeida's testimony that he did not receive the NOH or other notice of his 2005 removal hearing is strongly outweighed by other evidence in the record. In particular, the fact that the NOH was properly addressed and indicates that it was served by mail; the motive Perez-Almeida had to avoid his removal hearing in 2005; Perez-Almeida's failure to raise a lack of notice prior to the current criminal case (despite several interactions with immigration officials); and the lack of other evidence that individuals at the West Road address had any

---

[23]   This case is unlike the record in Diaz-Martinez, in which there was evidence from the alien's uncle (the alien's custodian), who was the only person with the mailbox key, that he never saw notice of alien's hearing, and that he had several issues with receiving mail at the address. Such evidence in Diaz-Martinez was probative of non-receipt. 380 F. Supp. 3d at 502-03.

issues receiving mail, all undercut the credibility of Perez-Almeida's assertion that he did not receive notice of his 2005 removal hearing. The Court thus concludes that Perez-Almeida has not carried his burden to demonstrate that he did not have notice of his 2005 removal hearing.

### (2) Conclusion As To Section 1326(d)

Perez-Almeida's collateral challenge under Section 1326(d) requires that he establish that he did not receive notice of his 2005 removal hearing because he neither exhausted his administrative remedies nor sought judicial review. See 8 U.S.C. § 1326(d)(1), (d)(2); Cortez, 2019 WL 3209956, at \*3; El Shami, 434 F.3d at 663. Because he has not established that he did not receive notice of his 2005 removal hearing, Perez-Almeida is not excused from satisfying Section 1326(d)(1) or (d)(2). Nor has he established a due process violation, as required by Section 1326(d)(3). See El Shami, 434 F.3d at 664-65 (failure to provide notice of immigration hearing is due process violation). Thus, Perez-Almeida has failed to satisfy any of the requirements of Section 1326(d).[24] The Motion, therefore, will be denied.

---

[24] Section 1326(d)(3) also requires a showing of prejudice (i.e. that but for the due process violation of lack of notice, there is a reasonable probability that Perez-Almeida would not have been deported in 2005). See El Shami, 434 F.3d at 665-66; Lopez-Collazo, 824 F.3d at 462. Perez-Almeida argues that, if he had notice, he would have attended his 2005 removal hearing and either sought to

## CONCLUSION

For the foregoing reasons, DEFENDANT'S MOTION TO DISMISS COUNT ONE (ECF No. 20) will be denied.

It is so ORDERED.

/s/     *R̶E̶P̶*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August **21**, 2019

---

stay in the United States, or sought voluntary departure. ECF No. 43.

The Court has serious doubts about Perez-Almeida's assertion that he would have attended his hearing; as discussed above, he had a clear motive to avoid the hearing. And, he now has a clear motive to say that he would have sought voluntary departure as a way to show prejudice. However, because Perez-Almeida has failed to satisfy Sections 1326(d)(1), (d)(2), or the due process prong of (d)(3), it is unnecessary to decide whether Perez-Almeida has demonstrated prejudice.