**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

UNITED STATES OF AMERICA,

v.                                                    Criminal No. 3:19-cr-61

DAVID PEREZ-ALMEIDA,

    Defendant.

**MEMORANDUM OPINION**

This matter is before the Court on DEFENDANT'S MOTION TO SUPPRESS EVIDENCE ON COUNTS TWO AND THREE (ECF No. 19) (the "Motion to Suppress"). For the reasons set forth below, the Motion to Suppress will be denied.

**BACKGROUND**

**I.   Procedural Context**

David Perez-Almeida ("Perez-Almeida") is charged in a three-count indictment with illegal reentry, pursuant to 8 U.S.C. § 1326(a) (COUNT ONE); possession of a firearm by an alien illegally and unlawfully in the United States, pursuant to 18 U.S.C. § 922(g)(5) (COUNT TWO); and possession of cocaine, pursuant to 21 U.S.C. § 844 (COUNT THREE). See ECF No. 3. He has moved to dismiss COUNT I (the "Motion to Dismiss") and to suppress evidence related to COUNTS II and III (the "Motion to Suppress") (collectively, the "Motions").[1] See ECF Nos. 19 and 20.

---

[1]   This MEMORANDUM OPINION addresses only DEFENDANT'S MOTION TO SUPPRESS EVIDENCE ON COUNTS TWO AND THREE (ECF No. 19).

The parties fully briefed both Motions, see ECF Nos. 19, 20, 22, 23, 25, 27, and the Court heard oral argument and received evidence on the Motions on June 18 and June 20, 2019.[2] Thereafter, the Court ordered the parties to submit supplemental briefing setting out their positions on both Motions in perspective of the evidence adduced during the evidentiary hearings. See ECF No. 39. The parties have submitted their supplemental briefing, and the Motion to Suppress is ripe for decision.[3]

## II. Factual Background[4]

On March 4, 2019 at approximately 3:16 p.m., Perez-Almeida was driving a black Chevrolet Impala[5] (the "Impala" or the

---

DEFENDANT'S MOTION TO DISMISS COUNT ONE (ECF No. 20) is addressed in a separate MEMORANDUM OPINION (ECF No. 51).

[2] The hearing transcript for June 18 is ECF No. 40 and the hearing transcript for June 20 is ECF No. 41. The hearing transcript is consecutively paginated, and this Opinion will use "Hr'g Tr.," followed by the page number, without reference to the ECF docket number.

[3] Reply briefs for both Motions were to be filed by July 26, 2019, but neither party filed a reply brief. See ECF No. 39. However, that is the date that the Motions became ripe for the Court's consideration.

[4] In this Memorandum Opinion, only the factual background pertinent to the Motion to Suppress is provided.

[5] The Impala is owned by Victor Borrios-Magana, Perez-Almeida's uncle. Def. Ex. 11 at 3; Hr'g Tr. 4-6. The Government raised the issue of whether Perez-Almeida had standing to challenge the search of the Impala. ECF No. 22. However, in its supplemental brief (ECF No. 42), the Government did not discuss standing, notwithstanding that the Court ordered the parties address that issue if the Government intended to continue to assert that Perez-Almeida

"vehicle") on I-85 in Virginia, when he was stopped by Brunswick County Sheriff Lt. Jonathan Clary ("Clary") for having tinted windows that violated Virginia law.[6] Hr'g Tr. 11-14 (Clary's testimony about the initiation of the traffic stop); Gov't Ex. 1 (Clary's body camera footage showing that the traffic stop was initiated at 15:16, or 3:16 p.m.). Along with Perez-Almeida in the vehicle were Sandra Hernandez ("Hernandez") (in the front passenger seat) and Robert Covington ("Covington") (in the rear passenger seat). See Def. Ex. 11 at 9 (identifying Covington);[7] ECF No. 22 at 3 (identifying Hernandez).

Immediately upon approaching the vehicle, Clary asked Perez-Almeida if he had his driver's license. Def. Ex. 11 at 1. Perez-Almeida responded "No," and told Clary that he had a passport, but that it was not with him. Id. Clary then asked whether Perez-

---

lacked standing. ECF No. 39. Because the Government appears to be no longer raising a standing argument, the Court assumes for the purposes of this Opinion that Perez-Almeida has standing to challenge the search of the Impala. In any event, there is evidence that Perez-Almeida was in legitimate possession of the Impala. Hr'g Tr. 5. See United States v. Rusher, 966 F.2d 868, 874 (4th Cir. 1992) (driver in legitimate possession of vehicle had reasonable expectation of privacy in vehicle).

6    The window tinting was so dark that Clary could not tell if anyone was sitting in the back seat of the Impala. For his own safety, Clary asked Perez-Almeida to partially roll down the rear window so "I could see all the occupants in the vehicle and know how many I was dealing with." Hr'g Tr. 14-15.

7    Def. Ex. 11 is a transcript of Clary's body camera footage from the traffic stop. The parties agreed that it is an accurate reflection of the body camera footage. Hr'g Tr. 14.

3

Almeida had "anything that tells me who you are," to which Perez-
Almeida said "I don't have anything." Id. at 2. Perez-Almeida
told Clary that he had never been licensed anywhere, and again
stated that he had a passport, but that it was not with him. Id.
at 2-3. Clary returned to his police car to get a clipboard and
paper so that occupants of the vehicle could write down their
information. While he was in his police car, Clary requested
backup. Id. at 5; Hr'g Tr. 25.

Returning to the Impala, Clary asked Perez-Almeida to write
down his identifying information so that Clary could attempt to
determine Perez-Almeida's identity.[8] Def. Ex. 11 at 5, 7-8. The
backseat passenger, Covington, also confirmed that he had no
identification with him in the vehicle. Id. at 5 ("All of my
identification is in Greensboro."). Covington first told Clary
that he was "licensed in Greensboro," id. at 6, but then told Clary
that he only had an identification card at his house. Id. at 9.
Clary then had Covington write down his identifying information so
that his identity could be confirmed. Id. at 8-9. Hernandez
presented an unstamped passport, but no driver's license. Def. Ex.
11 at 15; Hr'g Tr. 17 (Clary's testimony that Hernandez provided
a passport).

---

[8]    While Perez-Almeida was writing down his information, Clary
permitted Covington to exit the Impala to use the restroom. Gov't
Ex. 1; Def. Ex. 1 at 5-7.

4

Clary returned to his police car with the clipboard and called the dispatcher, who confirmed that Covington did not have a driver's license and that he was not wanted. Def. Ex. 11 at 11; Hr'g Tr. 17-18. Clary also asked the dispatcher about Perez-Almeida. Def. Ex. 11 at 12.

Approximately 16 minutes into the traffic stop, and while Clary was sitting in his police car (attempting to verify the identity of the three occupants of the Impala, none of whom had convincing proof thereof), Deputy Aaron Peter ("Peter") arrived as backup. Hr'g Tr. 25; Gov't Ex. 1 (Peter appearing at time stamp 15:32). Clary told Peter that he could not identify anyone in the vehicle, that they were "acting sketchy," that they "seemed like they kind of a whacky crew," but that he did not have "a reason to search [the Impala]." Def. Ex. 11 at 13. Clary told Peter, "It will be interesting to see when I get done [printing tickets] if they'll let us or not." Id. at 17. Clary testified that this statement meant that, once he was finished printing the tickets, he would ask for Perez-Almeida's consent to search the vehicle. Hr'g Tr. 26. Clary further testified that, while he did not "have probable cause to enter [the] vehicle," the passengers of the Impala "were very suspicious to me at the time," in part because he could not identify them, because "[t]hey made several statements about where they were coming from and where they were going," and

5

because he "noticed very little luggage inside the vehicle and multiple cell phones." Id. 25-26.

Just before Peter arrived (while Clary was working in his police car), Clary began the process of writing tickets for Perez-Almeida. See Hr'g Tr. 24; Gov't Ex. 1. Clary wrote tickets for Perez-Almeida for: (1) no valid driver's license; (2) illegal window tint; (3) dangling object to obstruct view; and (4) a cracked windshield.[9] See Def. Ex. 11 at 14-15.

While Clary was writing the tickets, Peter had gone to speak with the vehicle occupants to see if he could determine who the occupants were. Hr'g Tr. 36; Gov't Ex. 1 (time stamp 15:35:46). Upon returning to the side of Clary's police car approximately two minutes later, Gov't Ex. 1 (time stamp 15:37:27), Peter suggested patting down Perez-Almeida to see if he had a wallet on him. Def. Ex. 11 at 18. Clary said he was "okay with whatever at this point." Id.

---

[9]     Clary testified that he had a printer in his police car. Hr'g Tr. 24. During the traffic stop, Clary's printer malfunctioned, causing a delay in presenting the tickets to Perez-Almeida. Id. 26 (Clary's testimony about the delay attributed to the printer malfunction); Def. Ex. 11 at 16-17. Clary's body camera video shows that Clary was attempting to operate his in-vehicle printer from approximately time stamp 15:32 (about 16 minutes into the traffic stop) to approximately time stamp 15:45 (about 29 minutes into the traffic stop), when Clary leaves the police car with the tickets. See Gov't Ex. 1.

6

Peter returned to the Impala while Clary finished writing and printing the tickets. Govt. Ex. 1 (time stamp 15:39:25 showing Peter returning to the Impala). Peter got Perez-Almeida out of the Impala and patted him down. Hr'g Tr. 27-28, 36 (testimony of Clary); Hr'g Tr. 67 (testimony of Peter). No seizure occurred.

Approximately 29 minutes into the traffic stop, Clary finished printing the tickets, and approached Perez-Almeida and Peter, who were standing outside the Impala.[10] Gov't Ex. 1 (time stamp 15:45:01 showing Clary leaving his police car); Def. Ex. 11 at 18-21. Clary told Perez-Almeida that he was being cited because he was the driver "so you're in charge of the vehicle." Def. Ex. 11 at 18-21. Clary then explained the tickets to Perez-Almeida; and asked him to sign each one. Id. Once Perez-Almeida signed the tickets, Clary gave him copies of them.[11] Id. at 21. At this point, Clary had not returned Hernandez's passport or the vehicle registration. Id. at 21; Hr'g Tr. 27.

---

[10]   Before exiting his police car, and in anticipation of being granted consent to search the vehicle, Clary donned protective gloves. Hr'g Tr. 40.

[11]   The parties agreed that the entire process starting with Clary explaining and serving the tickets on Perez-Almeida and ending with Perez-Almeida giving Clary consent to search the vehicle took three minutes. Hr'g Tr. 61. The body camera footage confirms that Clary began explaining the tickets to Perez-Almeida at 15:45:05 and consent was granted at 15:48, or almost exactly three minutes. Gov't Ex. 1.

7

Four seconds later, Clary and Perez-Almeida had the following exchange:

Clary:          There's a lot of drugs and guns
                that go up and down our highways in
                Virginia.

Perez-Almeida:  Yeah.

Clary:          So since you're the vehicle
                operator, you're in charge of it.
                Do you have a problem if we take a
                quick look to make sure there's
                nothing – no guns, or anything, in
                the car? No guns, drugs?

Perez-Almeida:  Like checking?

Clary:          Just take a look. Yeah. If you
                don't have nothing, there's no
                reason, right?

Perez-Almeida:  I guess.

Clary:          All right. Have a seat.

Def. Ex. 11 at 21; Gov't Ex. 1 (showing this exchange starting at time stamp 15:47:44). Clary interpreted Perez-Almeida to be giving "a positive response, like go ahead" and proceed to search. Hr'g Tr. 27. In preparation for the search, and for officer safety, Clary asked Covington and Hernandez to exit the vehicle and sit along the guardrail.[12] Def. Ex. 11 at 22-24.

_____

[12]  Clary gave Hernandez her passport back when he asked her to exit the vehicle. Def. Ex. 11 at 23.

8

Clary then started to search, beginning at the driver's side door. Hr'g Tr. 29. Perez-Almeida did not tell Clary to stop the search process or complain that he had not consented to it. Clary testified that, "[a]s soon as I opened the door, I immediately noticed the handle of what appeared to be a pistol coming from underneath the driver's seat."[13] Id.; id. 59. He asked Perez-Almeida about the gun, to which Perez-Almeida responded, "I didn't know there was a gun in the car." Def. Ex. 11 at 26. Clary asked Peter to handcuff Perez-Almeida at that point. Id. During the search, Clary also uncovered a "white powdery bag inside the magazine pouch" under the driver's seat. Id. at 28; id. at 33 (referring to the powder as "cocaine"); Hr'g Tr. 60.

Clary then told the Impala's occupants that Perez-Almeida, as the driver, was "probably going have to take a ride for it," but that Covington and Hernandez could "ride with the tow truck driver" if they could "behave." Def. Ex. 11 at 31-32. Hernandez asked Clary if her sister could pick up the Impala so they would not have to pay for the tow, but Clary refused when he learned that the sister lived more than 20 minutes from the scene. Id. at 32; Hr'g Tr. 46-47 (Clary testifying that the passengers all appeared to be from out of state, so there was "no reason to wait hours for

_____

[13] A second gun was also found during the search under the passenger's seat. Hr'g Tr. 60.

9

somebody to show up on the side of the road to come pick [the vehicle] up"). Clary told the occupants that "I can't safely leave the vehicle and its contents here. And y'all can't drive it, so I have to get you off the interstate as well." Def. Ex. 11 at 32. Clary took Perez-Almeida into custody for the firearms and drugs found in the Impala. Hr'g Tr. 50.

Thereafter, the Impala was towed to Ricky's Service Center. Id.; id. 68 (testimony of Peter). No inventory search was done pursuant to the tow because the vehicle had already been searched.[14] Id. Covington and Hernandez left the scene with the tow truck. Id. 69 (discussing how "the other two occupants" were going to go with the Impala).

## DISCUSSION

The Fourth Amendment guarantees "[t]he right of the people to be secure in their . . . houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "The touchstone of the Fourth Amendment inquiry is one of simple reasonableness." United States v. Bumpers, 705 F.3d 168, 171 (4th Cir. 2013); United States v. Coleman, 588 F.3d 816, 819

---

[14]   Peter testified that, had the search not already occurred, the typical practice for a vehicle (like the Impala) being towed would be to conduct an inventory search. Hr'g Tr. 69-70.   And, such a search would have occurred in this case because none of the Impala's occupants could present a valid driver's license.

10

(4th Cir. 2009). As the Supreme Court of the United States teaches, "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006) (quoting Scott v. United States, 436 U.S. 128, 138 (1978)) (emphasis and alteration in original).

The Motion to Suppress seeks to suppress the firearms and narcotics that were found by Officer Clary during the warrantless search of the Impala that Perez-Almeida was driving. Perez-Almeida makes several arguments in support of the Motion to Suppress. First, he argues that the police officers impermissibly extended the scope of the traffic stop. Second, he argues that he did not voluntarily consent to the search of the Impala. Third, he argues that the inevitable discovery doctrine does not apply. See generally ECF No. 45. In short, according to Perez-Almeida, Clary's search of the vehicle runs afoul of the Fourth Amendment, and the evidence found pursuant to that search must be suppressed. See id. The Government takes the opposite view on each of those three arguments. See generally ECF No. 42. Each theory will be addressed.

## I. **The Traffic Stop Was Not Impermissibly Extended**

First, Perez-Almeida argues that the traffic stop was

11

impermissibly extended because, once Clary handed the traffic tickets to Perez-Almeida, the legal basis for the traffic stop had ended. ECF No. 45 at 6; Hr'g Tr. 79. At that point, argues Perez-Almeida, Clary could only continue detaining him with reasonable suspicion or with Perez-Almeida's consent, neither of which he had. ECF No. 45 at 6. The Government, on the other hand, contends that the traffic stop did not end when Clary handed Perez-Almeida the tickets because no one in the vehicle was legally able to drive the Impala from the scene. See ECF No. 42 at 5-6; Hr'g Tr. 74. Officers Clary and Peter needed to determine how to move the Impala and its occupants from the side of the interstate, and until that time (including when Perez-Almeida gave consent to the search), the traffic stop was ongoing. Hr'g Tr. 73-74.

A traffic stop, even a brief one, constitutes a "seizure" under the Fourth Amendment, and thus must meet the "reasonableness" standard. See, e.g., United States v. Bernard, 927 F.3d 799, 804-05 (4th Cir. 2019); United States v. Bowman, 884 F.3d 200, 209 (4th Cir. 2018). To satisfy the "reasonableness" standard in the traffic stop context, the Court must ask two questions. See Bowman, 884 F.3d at 209. First, was the traffic stop "legitimate at its inception[?]" United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017).[15] Second, were "the officer's actions during the seizure.

---

[15] Perez-Almeida does not dispute that the traffic stop (for

12

. .reasonably related in scope to the basis for the traffic stop[?]" United States v. Williams, 808 F.3d 238, 244 (4th Cir. 2015).[16] The first question is not in dispute.

The second question depends on the length and circumstances of the traffic stop. As the Fourth Circuit recently explained in Bernard, the seizure must be "limited to the length of time reasonably necessary to issue the driver a citation and determine that the driver is entitled to operate his vehicle." 927 F.3d at 805 (emphasis added); United States v. Branch, 537 F.3d 328, 336-37 (4th Cir. 2008) (same); Rusher, 966 F.2d at 876 ("When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.") (emphasis added); see also Bowman, 884 F.3d at 210 (typical incidents of a permissible traffic stop include inspecting the driver's identification and license, verifying that the vehicle is inspected, verifying insurance coverage, and determining whether the driver is subject to outstanding warrants).

---

unlawful window tint) was "legitimate at its inception," and, accordingly, the Court need not address this question further.

[16]  Once the original justification for the traffic stop has ended, a police officer may extend the stop only with reasonable suspicion of illegal activity or with the driver's consent to continue the stop. See Bernard, 927 F.3d at 805; Bowman, 884 F.3d at 210; Williams, 808 F.3d at 245-46.

13

Also, a police officer may "conduct an investigation unrelated to the reasons for the traffic stop as long as it '[does] not lengthen the roadside detention.'" Bowman, 884 F.3d at 210 (quoting Rodriguez v. United States, 135 S.Ct. 1609, 1614 (2015)) (emphasis and alteration in original). Whether a traffic stop is too long is not subject to "mathematical precision." Branch, 537 F.3d at 336. Rather, the question is whether the stop was "longer than was necessary, given its purpose." Id. Once the purpose of the traffic stop has ended, however, even a "de minimis" extension of the traffic stop requires additional justification (reasonable suspicion or consent). See Bowman, 884 F.3d at 210.

The initial purpose of the traffic stop in this case was for improper window tinting. However, as Clary testified (and the body camera footage clearly shows), the mission of the traffic stop quickly changed from issuing a ticket for tinted windows to identifying the occupants of the Impala and determining if any of them had a valid driver's license, i.e., whether anyone was entitled to operate the vehicle. The record shows repeated attempts by Clary to identify the occupants of the Impala and to find a licensed driver, including: (1) initially asking the passengers for identification; (2) asking Perez-Almeida and Covington to write down information that could be used to verify whether they could drive; and (3) calling to dispatch in an attempt

14

to confirm a licensed driver in the Impala. See Def. Ex. 11 at
1-12.

Approximately 16 minutes into the stop, based on his
interactions with the occupants of the Impala, Clary had determined
that none of the passengers (including Perez-Almeida) had a valid
driver's license. Hr'g Tr. 16; id. 20 ("I'm attempting to find a
driver, somebody who actually has a license."); id. ("[T]here's no
doubt" that none of the Impala's passengers had a license); id. 24
(confirming 16-minute figure). Without a licensed driver, Clary
could "[a]bsolutely not" let any of the passengers drive the
Impala away from the scene, and would have to call a tow truck.
Id. 22.

At 29 minutes into the traffic stop, Clary finished writing
the tickets for Perez-Almeida (after being delayed significantly
by malfunctions with his in-vehicle printer, see supra n.9), and
approached Peter and Perez-Almeida, who were standing outside the
Impala. Clary began explaining the tickets to him at 15:45:05 and
provided copies of the tickets to Perez-Almeida at 15:47:40. See
Gov't Ex. 1. Between 15:47:44 and 15:48:00 (16 seconds), Clary
asked for, and received, Perez-Almeida's consent to search the
Impala. Id. In other words, within 20 seconds after receiving
copies of the tickets, Perez-Almeida had consented[17] to the search

---

[17] See Section II, infra, addressing the consent issue.

of the vehicle.

In Perez-Almeida's view, the legal basis for the traffic stop ended at the point of Perez-Almeida receiving copies of the tickets, or at approximately 15:47:40 on the body camera video. Hr'g Tr. 77; Gov't Ex. 1. Extending the stop any further after that point to ask for consent was an unlawful seizure, argues Perez-Almeida. ECF No. 45 at 6.   In support of that argument, Perez-Almeida cites United States v. Ogunbiyi, 957 F. Supp. 89, 91-94 (N.D.W. Va. 1997). However, Ogunbiyi stands on significantly different factual footing than this case because both occupants of the vehicle in Ogunbiyi could validly operate the car (Wright, the passenger, had a valid driver's license, and Ogunbiyi had a valid learner's permit). See id. at 91. Thus, the traffic stop in Ogunbiyi was over when the warning ticket was issued because the vehicle could be legally driven away, and the police lacked other justification to continue detaining the occupants.

Perez-Almeida's reliance on Ogunbiyi misses the mark because, as the Fourth Circuit has held on several occasions, one of the purposes of a traffic stop is to ensure that the driver is legally operating the vehicle. Bernard, 927 F.3d at 805; Branch, 537 F.3d at 337; Rusher, 966 F.2d at 876; see also United States v. Cervi, 2015 WL 5598420, *2 (W.D. Va. Sept. 21, 2015) (driver could not establish "entitlement to operate the rental vehicle" because he

16

had a suspended license, and therefore, "Cervi was certainly not allowed to 'proceed on his way' with a suspended license"). If that requirement is not satisfied, the stop is not at an end.

None of the Impala's passengers were able to drive the vehicle away from the scene because none of them presented a valid driver's license. And, Clary's attempt to verify whether anyone had a driver's license showed that none of the three were licensed drivers. The vehicle, then, either needed to be picked up by a licensed driver or towed from the side of the interstate. See, e.g., Hr'g Tr. 47. But, in either scenario, at the moment that Clary issued the tickets to Perez-Almeida, the Impala's occupants could not be permitted to simply "proceed on [their] way." Branch, 537 F.3d at 336; Hr'g Tr. 47 (Clary's testimony that the Impala's occupants had no one within a "reasonable distance" who could pick up the Impala). Thus, the traffic stop was ongoing. In light of the circumstances and the record in this case, that continuation of the traffic stop was objectively reasonable.[18]

Additionally, only 20 seconds elapsed between when Clary handed the tickets to Perez-Almeida and when Perez-Almeida gave his verbal consent to search the Impala. Gov't Ex. 1. Even

---

[18] That the traffic stop was ongoing is further supported by the fact that, at the point of giving the tickets to Perez-Almeida, Clary had not yet returned the passport to Hernandez or returned the vehicle's registration. See Gov't Ex. 1; Def. Ex. 11 at 21.

assuming that the traffic stop legally ended when Clary handed the tickets to Perez-Almeida (it did not), the Court would not find that this extension was unreasonable, given how fluid the situation in this case was and how short the time period was.

In sum, a traffic stop must be viewed for its objective reasonableness. The traffic stop here was not impermissibly extended because no one could drive the vehicle away at the moment that Clary issued the tickets.

## II. **Perez-Almeida Voluntarily Consented To The Vehicle Search**

Perez-Almeida next argues that he did not provide voluntary consent to search the Impala. He argues that his statement "I guess" to Clary's request to perform the search was not "voluntary, unequivocal, specific and intelligent consent." ECF No. 45 at 9. According to Perez-Almeida, several factors show that he did not give voluntary consent, to wit: that he is not a native English speaker; that Clary spoke to Perez-Almeida in fast English; that Perez-Almeida was repeatedly asked if he had identification; that Perez-Almeida was ordered out of the car by Peter and patted down; that Peter spoke in an assertive tone to Perez-Almeida; that both Clary and Peter were in close proximity to Perez-Almeida in uniforms and with weapons; and that Clary inquired about Perez-Almeida's immigration status. See id. at 9-10.

On the other hand, the Government argues that the totality of

18

the circumstances show that Perez-Almeida gave voluntary consent. See ECF No. 42 at 6-7. At the time of the consent, Perez-Almeida was not under arrest or in handcuffs; the officers had been pleasant throughout the traffic stop (including allowing Covington to use the restroom); the traffic stop was not unnecessarily long; and there were only two officers on scene, but three occupants in the vehicle, none of whom could provide valid identification. See id.

It is axiomatic that "[a] defendant who voluntarily consents to a search waives his Fourth Amendment rights, and the police officer may conduct the search without probable cause or a warrant." United States v. Brugal, 209 F.3d 353, 362 (4th Cir. 2000) (en banc); United States v. Perrin, 45 F.3d 869, 875 (4th Cir. 1995); see also Schneckloth v. Bustamonte, 412 U.S. 218, 235 (1973). Courts "apply a subjective test to analyze whether consent was given, looking to the totality of the circumstances." United States v. Robertson, 736 F.3d 677, 680 (4th Cir. 2013). The Government has the burden to prove consent. See id.

In determining whether Perez-Almeida gave voluntary consent to the search, the Court is guided by a number of factors: (1) the officers' conduct; (2) the number of officers present; (3) the time of the encounter; and (4) the characteristics of the person giving consent, including age, education, maturity, intelligence,

and experience. See Robertson, 736 F.3d at 680; United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996) (en banc). Whether the police officers told the defendant "of his right to decline the search is a highly relevant factor" in determining voluntariness, see Robertson, 736 F.3d at 680 (internal quotation omitted), but the Government "need not demonstrate that the defendant knew of his right to refuse consent to prove that the consent was voluntary." Lattimore, 87 F.3d at 650; see also United States v. Gomez-Zunum, 751 Fed. Appx. 374, 376-77 (4th Cir. 2018) (unpublished) (per curium). Finally, "consent may be inferred from actions as well as words." United States v. Hylton, 349 F.3d 781, 786 (4th Cir 2003).

Here, through Clary's body camera video (Gov't Ex. 1) and Clary's testimony, the Government has met its burden to prove that Perez-Almeida voluntarily consented to the search of the Impala. The exchange during which Perez-Almeida consented to the search started four seconds after Clary handed the tickets to Perez-Almeida (indicating that the traffic stop was not impermissibly extended) and lasted for 16 seconds:

Clary:          There's a lot of drugs and guns
                that go up and down our highways in
                Virginia.

Perez-Almeida:  Yeah.

Clary:          So since you're the vehicle
                operator, you're in charge of it.

20

> Do you have a problem if we take a quick look to make sure there's nothing - no guns, or anything, in the car? No guns, drugs?

Perez-Almeida:   Like checking?

Clary:           Just take a look. Yeah. If you don't have nothing, there's no reason, right?

Perez-Almeida:   I guess.

Clary:           All right. Have a seat.

Def. Ex. 11 at 21; Gov't Ex. 1 (showing this exchange between 15:47:44 and 15:48:00). Clary interpreted Perez-Almeida to be giving "a positive response, like go ahead" when Perez-Almeida said, "I guess." Hr'g Tr. 27.

Having reviewed the body camera video and Clary's testimony, the Court finds that Perez-Almeida gave voluntary consent to the search of the Impala. During the 16-second exchange during which Perez-Almeida gave consent, Clary was speaking in a calm tone, explaining the reason he wanted to look in the Impala ("There's a lot of drugs and guns that go up and down our highways in Virginia."). Clary used simple phrases like, "No guns, drugs[.]" Perez-Almeida demonstrated that he understood Clary's request when he said, "Like checking?[,]" and moved his hands in a circular fashion, indicating he understood that "checking" meant checking around the Impala. And, when Clary said, "Just take a look. Yeah.

21

If you don't have nothing, there's no reason, right?[,]" Perez-Almeida nodded his head and shrugged before saying "I guess." The body camera video confirms that: Clary clearly explained why he was asking for permission to search and what he was looking for; that Perez-Almeida understood what Clary was telling him; and that Perez-Almeida, both by saying "I guess" and through his body language, agreed that Clary could search the Impala.

In addition to Perez-Almeida's words and body language during the 16-second exchange, other factors militate strongly towards a finding of voluntary consent. The consent occurred during a traffic stop on Interstate 85, a "well-travelled highway, during the middle of the afternoon." See Lattimore, 87 F.3d at 651; Robertson, 736 F.3d at 681 (finding "broad daylight" to be relevant factor). Throughout the traffic stop, the police officers were friendly and respectful towards the passengers in the Impala, taking several steps to determine their identities, allowing Covington to exit the Impala to use the restroom, and speaking calmly to them.[19] See Robertson, 736 F.3d at 681 (interactions

---

[19] The fact that Clary made several immigration-related inquiries of the passengers in the Impala does not change the analysis. When these statements were made, Clary was attempting to find out who the passengers were, and those questions were made to that end. Further, Perez-Almeida states that "Officer Peter raised his voice and spoke in an assertive tone to Mr. Perez-Almeida," ECF No. 45 at 10, but the Court has no evidence to support that statement. To the extent that such a statement is reflected on the entirety of Officer Peter's body camera footage,

22

"characterized by relaxed, friendly conversation between the two sides" was indicative of voluntary consent). When asking for consent, Clary did not accuse Perez-Almeida of doing anything illegal. See id. at 680-81 (initial accusatory question suggested lack of voluntary consent). Perez-Almeida was never in handcuffs, had never been threatened with arrest, and would have been free to leave with the tow truck (of course, once the search occurred and the drugs and firearms were found, he was not free to so leave). Hr'g Tr. 28 (testimony of Clary); id. 70-71 (testimony of Peter). See Lattimore, 87 F.3d at 651 ("[A]t no time did the officer use force or a threat of force to coerce Lattimore's consent.").

Further, there were two police officers, but three passengers, present at the traffic stop. When Perez-Almeida gave consent, he was the only passenger out of the Impala with Clary and Peter, but nothing about their interaction suggests that the officers intimidated Perez-Almeida into giving consent. See Robertson, 736 F.3d at 680 (five uniformed officers and three patrol cars at the scene was factor in finding involuntary

---

that evidence has not been presented to the Court. Finally, Clary did tell Perez-Almeida that he and Peter did not "give a shit" about Steven (someone who Perez-Almeida said could identify him), but Clary's body camera footage makes clear that this statement was made as Clary was trying to serve the tickets on Perez-Almeida. Def. Ex. 11 at 18; Gov't Ex. 1 (time stamp 15:45:19). Clary's tone suggests that he was trying to move the encounter along and was not hostile.

consent); United States v. Mallicone, 2017 WL 3575894, *4 (W.D. Va. Aug. 18, 2017) (the presence of five or six police officers "is an intimidating presence to one individual").

Finally, Perez-Almeida's characteristics do not suggest anything other than voluntary consent. He is in his mid-30s and told Clary that he had been in the United States for 18 years. Def. Ex. 11 at 21. Although English is not his native language, throughout the traffic stop, he demonstrated that he fully understood what was happening, including asking "[l]ike checking," to confirm his understanding of what Clary meant when Clary was asking for permission to search the Impala. It does not appear that the police informed Perez-Almeida that he could refuse the request to search, but the Government does not have to prove that Perez-Almeida knew of his right to decline consent. See Lattimore, 87 F.3d at 650. Perez-Almeida's characteristics support a finding of voluntary consent.

It is true that Peter patted down Perez-Almeida when he got Perez-Almeida out of the vehicle. Hr'g Tr. 67 (testimony of Peter). Perez-Almeida argues that this pat-down was "an illegal pat down because Officer Peter did not possess reasonable articulable suspicion that Mr. Perez-Almeida was armed, and Officer Peter admitted that he patted him down to see if he had a wallet." ECF No. 45 at 10 n.4. Assuming that Peter conducted an

24

illegal pat-down, that is one factor in the totality of circumstances to be considered in whether Perez-Almeida gave consent; it is not dispositive, and Perez-Almeida does not argue that it is. The pat-down was an innocuous event and does not cut against a finding of consent.

It is also true that Perez-Almeida did not say the word "yes" to the search or sign a written consent form.[20] That does not change the analysis because the statement of "I guess," along with non-verbal signals like nodding, and the other indicia of voluntary consent, discussed above, are sufficient to show that Perez-Almeida voluntarily consented. See United States v. Radford, 856 F.3d 1147, 1150 (7th Cir. 2017) ("'I guess so' does literally mean 'yes,' even if half-heartedly, and nothing otherwise indicated that [the defendant's] response was not voluntary."). And, there is no requirement that voluntary consent be written. Lattimore, 87 F.3d at 651.

Nor is this a case of a "begrudging submission to a command." Robertson, 736 F.3d at 680; United States v. Worley, 193 F.3d 380, 386-87 (6th Cir. 1999) (affirming district court's granting motion to dismiss where the defendant had said "You've got the badge, I

---

[20]  Clary acknowledged that the Sheriff's Department has had consent forms "in the past" and that he did not ask Perez-Almeida to sign such a form. Hr'g Tr. 43-44. It is not clear from Clary's testimony whether the Sheriff's Department currently employs a written consent form.

guess you can," because it was more akin to an "expression of futility in resistance to authority or acquiescing in the officer's request"). In Robertson, the Court of Appeals reversed a district court's finding of voluntary consent where there was a police dominated environment, Robertson had witnessed other people at the bus shelter getting patted down, the officer's first question to Robertson was accusatory, Robertson was not told he could refuse consent, Robertson gave no verbal indication of consent (rather, Robertson turned around and raised his hands in a show of submission to the officer's command), and his exit was blocked by the officer. See 736 F.3d at 679-81. Under the totality of the circumstances, the Court of Appeals held that Robertson's "consent" was "a begrudging surrender to Officer Welch's order," and was not voluntary. Id. at 681. The facts of Robertson that led the Fourth Circuit to find a lack of consent are not present here, as discussed above. Especially relevant in this case is the fact that Perez-Almeida gave verbal consent and it was not a police-dominated environment, like the one in Robertson. Reviewing the body camera video, it is not possible to conclude that Perez-Almeida's statement of "I guess" is a "begrudging surrender" to Clary.

Moreover, almost immediately after the consent was given, the search of the car began. If Perez-Almeida had not consented to

26

that search, one would expect that he would call that to the officer's attention. He did not do so. That is another bit of evidence comprising the totality of the circumstances.

Considering the totality of the circumstances under which Perez-Almeida consented to the search of the Impala, and considering the evidence presented by the Government, the Court finds that Perez-Almeida voluntarily consented to the search of the Impala. The indicia of voluntary consent—the officers' demeanor, the time of day, the manner in which Perez-Almeida gave verbal consent, and Perez-Almeida's characteristics—outweigh any evidence suggesting a lack of voluntary consent. Thus, the Motion to Suppress will be denied because Perez-Almeida consented to the search.

## III. In The Alternative, Inevitable Discovery Applies

However, even assuming that Perez-Almeida's consent was involuntary, the Motion to Suppress will still be denied under the "inevitable discovery" doctrine. The Government argues that the guns and drugs found in the Impala would have been found, notwithstanding Clary's consent search, because the Impala was going to be towed off the interstate. And, prior to such a tow, the police officers would have conducted an inventory search of the Impala, during which they would have found the guns and drugs. See ECF No. 42 at 7-10. Perez-Almeida, on the other hand, contends

27

that inevitable discovery does not apply here because the evidence establishes that there was no standardized criteria for when an inventory search would be conducted. ECF No. 45 at 10-12.

If the Government can establish "by a preponderance of the evidence that law enforcement would have 'ultimately or inevitably' discovered the evidence by 'lawful means,'" then the Fourth Amendment's exclusionary rule does not apply. United States v. Bullette, 854 F.3d 261, 265 (4th Cir. 2017) (quoting Nix v. Williams, 467 U.S. 431, 441 (1984)). A "lawful means" includes a vehicle inventory search. Id. A vehicle inventory search is permissible "(1) where the circumstances reasonably justified seizure or impoundment, and (2) law enforcement conducts the inventory search according to routine and standard procedures designed to secure the vehicle or its contents." Id.; see also Colorado v. Bertine, 479 U.S. 367, 371-76 (1987); United States v. Brown, 787 F.2d 929, 931-32 & n.3 (4th Cir. 1986).

The circumstances in this case demonstrate that a decision to tow the Impala from the side of the interstate was "reasonably justified." See Bullette, 854 F.3d at 265; Brown, 787 F.2d at 932-33 (impoundment reasonable where "there was no known individual immediately available to take custody of the car, or because the car could have constituted a nuisance in the area in which it was parked"); Cabbler v. Superintendent, Va. Penitentiary, 528 F.2d

1142, 1143, 1146 (4th Cir. 1975) (no Fourth Amendment violation where police impound a vehicle to protect it or to remove a nuisance where driver "has no means immediately at hand for the safekeeping of the vehicle").

Clary testified that, when no one in a vehicle has a driver's license, as here, "nobody can drive the vehicle away from there, so I would have to go through the process of completing our impoundment sheet, and I would have to call a tow service to come and pick the vehicle up." Hr'g Tr. 16; id. 22 (Clary is asked "once you know that none of the three people in this vehicle are licensed to drive, are you able to let them drive the vehicle away from the scene?" to which he responds, "Absolutely not."). Hernandez did ask if her sister could pick up the vehicle to avoid a tow, but Clary refused because he was concerned about safety along the busy interstate and because the sister did not live within a reasonable distance. See Hr'g Tr. 47, 52; Def. Ex. 11 at 31-32. Here, the evidence supports a finding that the Impala was parked along a busy interstate, that none of the Impala's occupants could legally drive the vehicle away, and that the occupants had "no means immediately at hand for the safekeeping of the vehicle" because Hernandez's sister did not live nearby. See Cabbler, 528 F.2d at 1146. In those circumstances, ordering a tow of the Impala is reasonable.

The evidence further supports that, when a vehicle is towed in a circumstance like the one in this case, an inventory search would be performed, and the evidence would have been found.[21] Clary testified that he would "go through the vehicle and list anything of value that was inside the vehicle just to protect the towing agency." Hr'g Tr. 16. The process of checking for items of value would "occur on the side of the interstate before the towing agency came and picked [the vehicle] up." Id. 17. Clary testified that inventorying and towing, as described above, is the Department's standard "procedure." Id. 22; see also Bullette, 854 F.3d at 266-67 (government need not provide written inventory policy so long as police officer provides sufficient explanation of the policy). Perez-Almeida also introduced the standard form that the Sherriff's Department uses when a vehicle is towed and inventoried, further indicating that the Sherriff's Department has a standard policy. Def. Ex. 13 (towed vehicle and inventory receipt form). The form in this case indicated that no inventory search had been performed. Id. Peter testified that the "inventory" box was checked "no" because the search had already occurred. Hr'g Tr.

---

[21] Clary testified that the vehicle would not be "per se[] impounded," but would be "towed for safekeeping." Hr'g Tr. 16. The vehicle is then kept at the tow yard until the registered owner of the vehicle could retrieve it. Id. 22. Whether it is called a tow or an impoundment, Clary's testimony makes clear that an inventory search would have occurred.

69. But, Peter also testified that, had the search not already occurred, the typical practice for a vehicle (like the Impala) being towed would be to conduct an inventory search. Id. 69-70.

The testimony of Clary and Peter establish that an inventory search would have occurred prior to a tow of the Impala. While Clary did not provide a step-by-step overview of the inventory policy, "[e]ven the most circumscribed inventory procedures call for an inventory of unsecured items located in an unlocked vehicle's interior." Bullette, 854 F.3d at 266; id. ("[W]e have never required the government to provide a written impoundment-and-inventory policy or elicit step-by-step testimony concerning such a policy to meet its burden under the inevitable-discovery doctrine."). Clary testified that the first gun that he found during the search was immediately visible upon his opening of the driver's side door. Hr'g Tr. 29-30, 57. Thus, even under the most circumscribed inventory policy, the first gun would have been discovered (the white powdery substance that the officers determined to be cocaine was attached to the holster of this first gun).

In sum, through the testimony of Clary and Peter, the Government has met its burden to establish that the evidence in the Impala would have been found inevitably. Ordering a tow of the Impala under the circumstances was reasonable, and the officers

31

established that an inventory search of a towed vehicle would occur as a matter of policy. During such a search, the evidence would have been found because it was clearly visible upon opening the driver's door. The Motion to Suppress is also denied on the basis of "inevitable discovery."

## CONCLUSION

For the foregoing reasons, DEFENDANT'S MOTION TO SUPPRESS EVIDENCE ON COUNTS TWO AND THREE (ECF No. 19) will be denied.

It is so ORDERED.

/s/   *R E P*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August 2b, 2019